# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### AT CHARLESTON

**UNITED STATES OF AMERICA**

**v.**                                          **Case number: 2:21-cr-00127**

**RAYMOND DUGAN**

### DEFENDANT'S SENTENCING MEMORANDUM
### AND MOTION FOR DOWNWARD VARIANCE

Raymond Dugan, by counsel,   David Schles, submits this sentencing  memorandum and motion for downward variance for the Court's consideration. This court presided over the trial and is familiar with the evidence presented and the finding of the jury. Neither the government nor Mr. Dugan have objections which would affect the guidelines calculations in the presentence investigation report (hereinafter "PSR") so this memorandum will focus on the 18 U.S.C. § 3553 (a) factors and the grounds for a downward variance sentence. The parties agree that the Total Offense Level is 31 and Mr. Dugan has zero criminal history points and a criminal history category of I; the guideline imprisonment range is 108 months to 135 months. The defendant will also  address his objections to certain recommended conditions of supervised release and restitution.

### The 18 U.S.C. § 3553 (a) Factors and Grounds for a Downward Variance

Mr. Dugan's  advisory guideline range is 108-135 months.  A 108 month  term of imprisonment  would be significantly greater than necessary to achieve the statutory sentencing purposes of 18 U.S.C § 3553(a).  Mr. Dugan therefore moves this court to  impose a downward

variance sentence of 36 months.  He relies upon the following § 3553(a) factors in support of the requested sentence.

### 18 U.S.C. § 3553 (a)(1): The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

First, the contraband files found on the computer belonging to Mr. Dugan show that he does not have the characteristics which are common to most who possess or view child pornography. The files were not organized or categorized in any fashion as is frequently seen and he demonstrates no attributes consistent with "collectors" of child pornography. The jury convicted Mr. Dugan of accessing with intent to view images containing child pornography. The government superseded the indictment in this matter presumably because it believed the evidence did not support the original allegation of intentional possession. Contraband files were found only on a single device out of the many seized from his house and it appears those files were present because the operating system and browser saved the files in the locations in which they were found automatically and without intentional human action to save them. Clearly, the jury has found Mr. Dugan guilty of accessing with intent to view but on the wide spectrum of child sexual exploitation offenses, this presents a lesser degree of culpability than the majority of offenses including those other offenses related solely related  to child pornography and involving no direct contact with minors.

Mr. Dugan has also demonstrated throughout his life that he was a devoted family man who took it upon himself to care for his family's needs despite it requiring significant sacrifice. As  one strong example, late in their lives his parent experienced financial difficulties due to his father's failing health. In response, Ray bought a house for his aging parents near the house he

lived in with his wife and son and brought his parents from Pennsylvania so he could personally care for them. After his father died, he continued to support and care for his mother in her last years.

Leading up to and during the period in question Mr. Dugan's life was in turmoil. First his father became ill and suffered financial hardship and then  Mr. Dugan's mother suffered  a prolonged  and painful battle with colo-rectal cancer which eventually killed her. During her final illness it fell upon Mr. Dugan, an only child, to care for his widowed mother. The grueling ordeal of caring for a suffering and dying parent greatly affected Mr. Dugan and his mother's progressive dementia as she declined made an already extremely difficult situation even worse. On top of that, Mr. Dugan's son Tyler suffers from chronic depression and experienced great despair and actually attempted suicide adding to Mr. Dugan's feeling of loss and helplessness. Ray also experienced his own financial struggles both as a result of supporting his parents and losing a well-paying sales  job when his employer's business failed. He, as he always has, found new employment and continued working hard to support his family. He was employed by Husky Corporation right yup to the date this court ordered him incarcerated following the trial.

Unsurprisingly, the travails of dealing with his father's decline and passing  his  mother's pain and suffering during her final illness and his only son's mental illness and emotional outbursts negatively affected his marriage as well. Mr. Dugan has admitted that he also faced his own suicidal ideation as he dealt with his family and personal issues. Mr. Dugan has also admitted that during the period he was at his lowest he began drinking excessively as a coping mechanism. (He relates that he ceased his drinking when his wife "ordered" him to stop and threw away all his alcohol.)

3

Mr. Dugan has been diagnosed with a depressive disorder and post-traumatic stress disorder which certainly affected his thinking and his behavior and may have been compounded by his excessive drinking. Depression and bouts of substance abuse are both recognized precursors for problematic Internet usage. *See* Knack, N. et. al, *Motivational Pathways Underlying the Onset and Maintenance of Viewing Child Pornography on the Internet*, BEHAVIORAL SCIENCES & THE LAW, 38(2), 100–116 (2020). Having hit the proverbial "rock bottom" Mr. Dugan has sought his own mental health treatment and feels as if he has gained insight into his own illness, his need for treatment and the need to develop positive and contructive ways of coping with the stressors in his life.

## 18 U.S.C. § 3553 (a)(2) Factors

As stated above, a sentence of 108 months is much greater than necessary to adequately achieve the purposes of sentencing. This court should give limited weight to the advisory sentencing range in this matter. As the Court is aware, the Sentencing Commission did not use an empirical approach to develop the non-production guideline in U.S.S.G. § 2G2.2. Instead, the Commission increased the base offense level and added enhancements "usually as a result of congressional directives." Sentencing Commission, REPORT TO THE CONGRESS: FEDERAL CHILD PORNOGRAPHY OFFENSES 249 (2012) (hereinafter "2012 report"). In promulgating the child pornography guidelines, the Sentencing Commission deviated from its "characteristic institutional" role in formulating § 2G2.2. Therefore, this court should not accept the recommended guideline range in the PSR (which defendant acknowledges properly follows the guideline structure).

As a threshold matter, the sentencing guidelines are purely advisory and remain just one

4

factor among many that the Court must consider in fashioning an appropriate sentence. *United States v. Booker*, 543 U.S. 220, 245 (2005). A guideline calculation based upon a sound methodology provides a "starting point and initial benchmark" for sentencing, but even then, the Court "may not presume that the Guidelines range is reasonable" and instead must "make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 49—50 (2007).

The weight courts usually give to the guideline calculation as an appropriate "starting point" is owed in part to the empirical approach typically employed by the Sentencing Commission, which "fills an important institutional role"—the promulgation of guidelines based "on empirical data and national experience, guided by a professional staff with appropriate expertise." *Kimbrough v. United State*s, 552 U.S. 85, 108—09 (2007) (internal quotation marks omitted). By this same reasoning, the guideline for a particular offense is entitled to very little weight when it "do[es] not exemplify the Commission's exercise of its characteristic institutional role," that is, when the guideline was drafted without the normal reference to empirical data. *Id.* In such cases, the Court may well conclude that a guideline sentence "yields a sentence greater than necessary to achieve § 3553(a)'s purpose, even in a mine-run case." *Id.*

The Sentencing Commission has amended § 2G2.2 multiple times over the years, not based on evolving empirical evidence but simply to increase the applicable guideline ranges in pace with the escalating statutory penalties for production offenses. *See,* 2012 Report at 291. Because this guideline did not result from an analysis of empirical data or derive from independent expertise, the Court may vary from the resulting guideline range in recognition that it does not reflect the sound judgment of the Commission. *See Gall*, 552 U.S. at 46 n.2 ("[T]he

5

Sentencing Commission departs from the empirical approach" when it "cho[oses] to key the Guidelines to the statutory mandatory minimum sentences" established by Congress.).

The Commission itself has issued multiple reports detailing the myriad problems with § 2G2.2. In 2021, the Commission issued a report criticizing the current guideline scheme and concluding that "the nonproduction child pornography sentencing scheme should be revised to account for technological changes in offense conduct, emerging social science research about offender behavior, and variations in offender culpability and sexual dangerousness." 2021 Report at 2.

Here, Mr. Dugan received a number of enhancements for conduct "that has become so ubiquitous that they now apply in the vast majority of cases sentenced under ... § 2G2.2." 2021 Report at 4. In fiscal year 2019:

Over 95% of child pornography offenders received enhancements for use of a computer;

Over 95% received the enhancement for images involving minors less than 12 years old;

84% of offenders received enhancements for sadistic or masochistic conduct;

77.2% of offenders were enhanced for having 600 or more images.

These enhancements, which were "originally . . . intended to provide additional proportional punishment for aggravating conduct," now apply to the "vast majority" of non-production offenders as a matter of routine. 2012 Report at 316; see also *United States v. Cruikshank*, 667 F. Supp. 2d 697, 702 (S.D.W. Va. 2009) ("Because they are not based on empirical data and past practices, the Guidelines for consumers of computer-based child pornography are skewed upward. Instead of imposing enhancements for more severe offenses, the § 2G2.2 enhancements apply in nearly every case").

Here, Mr. Dugan receives enhancements from his base offense level of 18 for images:

Involving a minor who has not reached 12 years old (+2);

Involving sadistic or masochistic conduct (+4);

Use of a computer (+2);

600 or more images (+5).

Thus, rather than facing a sentencing range of 27-33 months as would apply without these enhancements (the range corresponding to offense level 18 and zero criminal history points), the 13 level increase– based on conduct demonstrably involved in the vast majority of cases– catapults his offense level from 18 to 31 and his advisory sentencing range from 27-33 months to 108-135 months.

Given both the capability of and availability of modern technology, the enhancements for use of a computer and for the number of images disproportionately and irrationally increase the sentences that result from strict adherence to the structure of § 2G2.2. Virtually all present day offenses involve use of a computer, and high-speed internet service and compression utilities allow for a large number of images to be transmitted in a short period of time and without any long, complicated or involved action by the recipient. See *United States v. R.V.*, 157 F. Supp. 3d 207, 228-231 (E.D.N.Y. 2016). Numerous other district courts have found that the enhancement based upon the total number of images no longer provides for any reasonable distinction between large scale and small scale child pornography offenders as first envisioned by Congress and the Sentencing Commission. See, e.g.: *Cruikshank*, 667 F. Supp. 2d at 702; *United States v. Beiermann*, 599 F. Supp. 2d 1087, 1107 (N.D. Iowa 2009); *United States v. Hanson*, 561 F. Supp. 2d 1004, 1009 (E.D. Wis. 2008).

7

Drug quantity is often a reliable indicator of an offender's proportional culpability because large scale drug dealers necessarily must take many deliberate and separate actions both to obtain larger quantities of controlled substances and to develop organizations of the size and scope necessary to distribute such large quantities. This common factor in drug cases does not however apply with respect to child pornography. Due to the easy and inexpensive way to download files to a computer, the total number of images is not a reliable indicator of the culpability of a child pornography offender. *Beiermann*, 599 F. Supp. 2d at 1106. In *Cruikshank*, this Court held that U.S.S.G. § 2G2.2 was not entitled to the usual deference afforded to guidelines promulgated by the Sentencing Commission, in part because the quantity based enhancements were "untethered to moral culpability."

In addition to a growing number of courts, the very body that drafted § 2G2.2 has published findings detailing some of its many flaws and recommending amendment and reform.[1] The Sentencing Commission has recommended § 2G2.2 be drastically revised to establish three categories for enhancements in non-production cases that are supported by research and empirical evidence relating to actual culpability, harms caused, the need for deterrence and the likelihood of recidivism:

(1) The content of an offender's child pornography collection and nature of an offender's collecting behavior (in terms of volume, the types of sexual conduct depicted in the images, the ages of the victims depicted, and the extent to which an offender has organized, maintained, and

---

[1] United States Sentencing Commission, Federal Child Pornography Offenses (Dec. 2012); this 300+ page report and attached exhibits can be found at https://www.ussc.gov/research/congressional-reports/2012-report-congress-federalchild-pornography-offenses (last visited October 16, 2022).

protected his collection over time, including the use of sophisticated technology);

(2) The degree of an offender's engagement with other offenders – in particular, in an Internet "community" devoted to child pornography and child sexual exploitation; and

(3) Whether the offender has a history of engaging in sexually abusive, exploitative, or predatory conduct in addition to his child pornography offense.

2012 Report, Ch. 12 at 320.

The presence of aggravating factors from any of these three categories would warrant an enhanced punishment depending upon the degree that they are present in a particular case. Id. at 321. The proposed revisions would reflect changes in offense conduct and knowledge gained from emerging social science research and would better account for variations in an offender's capabilities and the potential for sexual dangerousness in the future. Id. at 322. Congress has yet to take any action in considering the Commission's recommendations for a new guideline for non-production child pornography offenders but this Court should evaluate the appropriate sentence for Mr. Dugan with these factors in mind rather than by strictly applying the current enhancement provisions. The number of images found on Mr. Dugan's computer is typical or less rather than abnormally high in the present day  and should not be considered an aggravating factor. Likewise the nature of the images found are typical for those engaged in nonproduction offenses and should not be considered an aggravating factor. Neither the ages of the minors portrayed nor the types of sexually explicit conduct involved vary from those now found in the "run of the mine" or typical cases. The forensic review of the  computer shows that the images were not organized or categorized to any degree nor  maintained or protected   by use of  sophisticated technology.

9

The evidence showed no  engagement with other offenders.  No evidence suggests that Mr. Dugan ever communicated with another person involved with child pornography  let alone interacted with a "community" devoted to child pornography and child sexual exploitation. At most the evidence showed Mr. Dugan visited a Dark Web website, an action requiring no human interaction. Furthermore, it is undisputed that there is absolutely no reason to suspect, let alone a shred of evidence to support any suspicion that Mr. Dugan ever engaged in sexually abusive, exploitative, or predatory conduct in addition to the  child pornography offense for which he has been convicted.

Looking at the factors which the Sentencing Commission's own research has identified as being empirically correlated with culpability in these cases, Mr. Dugan ranks among the lesser culpable defendants and least likely to reoffend.

As these flaws in the structure of  and the inequities which flow from application of this guideline become more apparent over time, more and more courts have  recognized the need to give greater weight to factors outside the guideline structure. Indeed,  only 30% of individuals sentenced under § 2G2.2 in fiscal year 2019 were sentenced within the guideline range. 2021 Report at 5, 76. "Judges have continued to sentence most non-production child pornography offenders below the guideline range, most often by imposing variances pursuant to their authority under 18 U.S.C. § 3553(a), but also increasingly at the request of the government." 2021 Report at 69. Therefore, it is not the majority of courts which vary downward who create sentencing disparities in these cases,  but the shrinking minority of courts that do not.

Moreover, in its recent study, the Sentencing Commission concluded that the overall recidivism rate for non-production defendants is low (27.6%) and the rate of sexual recidivism is

very low (4.3%). 2021 Report at 65. These results are consistent with recidivism data analyzed

by the Sentencing Commission indicating that "first offenders" such as Mr. Dugan generally pose

the lowest risk of recidivism. *See* U.S. Sent'g Comm'n, *Recidivism Among Federal Offenders: A*

*Comprehensive Overview* 18 (2016).

In addition to the statistical improbability of Mr. Dugan offending in the future, he will be

subject to stringent post-release conditions and federal and state sex offender requirements that

serve to protect the public and deter future criminal conduct. *See Lawrence v. Texas*, 539 U.S.

558, 575 (2003) (recognizing that the "stigma" imposed for violation of sex crime statute "is not

trivial"); *United States v. Mateo*, 299 F. Supp. 2d 201, 209-10 (S.D.N.Y. 2004) ("[B]eyond the

offender's actual deprivation of liberty when incarcerated, a host of other penalties and burdens

always attend criminal conviction, to name a few: losses of family life, of socioeconomic status,

of employment and career opportunities; diminution of certain civil rights and entitlements; and

countless humiliations and indignities commonly associated with living in confinement.").


### Supervised Release Conditions

The PSR recommends that the Court impose the twenty-one discretionary, or "special,"

conditions of supervised release set forth in L. R. Cr. P. 32.4. Mr. Dugan objects to the proposed

conditions set forth in Paragraphs 96, 106, and to the condition directing him to pay the $5,000

special assessment set forth in 18 U.S.C. § 3014.

### 1.  Paragraph 96

This condition is overbroad, unnecessary, and unduly infringes upon First Amendment

protections. This condition prohibits "visual depiction[s]" of "sexually explicit conduct,"

a term that is statutorily defined to include *simulated* sexual conduct. 18 U.S.C. § 2256(2)(A) (emphasis added). As written, this condition prohibits a defendant from accessing not only adult pornography, but also any movies or television shows that portray adult actors *simulating* sexually explicit conduct—a broad category of material that necessarily includes many mainstream and culturally significant television programs and films.

Several courts have recognized that pornographic and sexually explicit materials enjoy First Amendment protection, which means that courts must be sensitive to that consideration before imposing any restrictions for purposes of conditions of supervision.[2] Conditions like the one at issue in this case—banning *all* sexually explicit material, not just material involving children—infringe upon these protections and constitute a deprivation of liberty that is greater than reasonably necessary to achieve the goals of supervised release.[3]

Mr. Dugan  would not object to the revision of this condition as approved in  *United*

---

[2] See: *United States v. Siegel*, 753 F.3d 705 (7th Cir. 2014); *United States v. Adkins*, 743 F.3d 176, 193 (7th Cir. 2014); *United States v. Simons*, 614 F.3d 475, 483 (8th Cir. 2010); *United States v. Perazza-Mercado*, 553 F.3d 65, 74-77 (1st Cir. 2009); *United States v. Voelker*, 489 F.3d 139, 151 (3rd Cir. 2007); *United States v. Antelope*, 395 F.3d 1128, 1141-42 (9th Cir. 2005); *United States v. Guagliardo*, 278 F.3d 868, 872 (9th Cir. 2002).

[3] See, *e.g.: United States v. Medina*, 779 F.3d 55, 61–64 (1st Cir. 2015) (concluding ban on possessing "sexually simulating" material was plain error); *United States v. Gnirke*, 775 F.3d 1155, 1163–65 (9th Cir. 2015) (concluding ban on access to "sexually explicit material" constituted greater deprivation of liberty than necessary); *United States v. Goodwin*, 717 F.3d 511, 524–25 (7th Cir. 2013) (concluding that restriction on material depicting or alluding to sexual activity was not reasonably related to the statutory conditions and resulted in greater deprivation of liberty than necessary).

*States v. Benjamin Franklin Thomas*, Case No. 2:19-CR-00286, which reads as follows:

The defendant shall not possess any materials depicting and/or describing "child pornography" as defined in 18 U.S.C. 2256, nor shall the defendant knowingly enter, or knowingly remain in, any location, without the prior approval of the U.S. Probation Officer, where such materials can be accessed, obtained or viewed, including pictures, photographs, books, writings, drawings, videos, or video games.

### 2. Paragraph 106

Mr. Dugan objects to the imposition of the $5,000 special assessment. The statute states this assessment only applies to "non-indigent" defendants. 18 U.S.C. § 3014. Mr. Dugan currently has a positive net worth on paper, but has lost his job and obviously will be without income for the forseeable  future. Additionally, Mr. Dugan's wife has indicated she will seek a divorce and the inevitable property settlement will likely deplete Mr. Dugan's assets to a degree rendering him indigent given the substantial liabilities set forth in the PSR.

### Paragraph 126

The defendant objects to the restitution recommended in Paragraph 126.  As of the date of this filing, the defendant has received no documentation in support of restitution from either the government or the probation office.  The defendant notes that the Court may defer ruling on any restitution claims for up to 90 days, which should provide sufficient time for the necessary documentation to be supplied to the defense and for the undersigned to review it and, if necessary, request additional discovery or file additional briefing in advance of any hearing to determine what if, any restitution is supported by the facts.

## **Motion for Downward Variance**

The defendant, Raymond Dugan herein moves for a downward variance sentence based on the sentencing factors found at 18 U.S.C. § 3553 (a) as more fully elaborated upon above. A sentence of 36 months is appropriate and would fulfill the purposes of sentencing set forth in § 3553 (a)(2).

Respectfully Submitted,
Raymond Dugan,
By counsel,

**s/ David Schles**
David Schles (WV Bar #6375)
815 Quarrier Street
Suite 306
Charleston, WV 25301
(304) 344-1559
Schleslaw@gmail.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON**


**UNITED STATES OF AMERICA**


**v.**                                                          **Case number: 2:21-cr-00127**


**RAYMOND DUGAN**




**<u>CERTIFICATE OF SERVICE</u>**

      I, David Schles, counsel for defendant, Raymond Dugan,  do hereby certify that on this 20th  day of October 2022,  the foregoing   DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE was  served upon the following by CM/EMF electronic filing  to:


Ms. Julie White
Assistant United States Attorney
P. O. Box 1713
Charleston, WV  25326-1713


                                        s/ David Schles
                                        David Schles, WV Bar #6375
                                        815 Quarrier Street
                                        Suite 306
                                          Charleston, WV 25301
                                          (304) 344-1559
                                          Schleslaw@gmail.com