```
            IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                      AT CHARLESTON

_____x
                              :
UNITED STATES OF AMERICA,      : Criminal Action
                              :
              Plaintiff,       : No. 2:21-cr-00127
                              :
v.                            :
                              :
RAYMOND DUGAN,                 :*** REDACTED ***
                              :
              Defendant.       : APPEAL TRANSCRIPT
_____x
```

```
          TRANSCRIPT OF PRETRIAL MOTION HEARING
       BEFORE THE HONORABLE JOSEPH R. GOODWIN
          UNITED STATES DISTRICT COURT JUDGE
           IN CHARLESTON, WEST VIRGINIA
                  APRIL 29, 2022
```

APPEARANCES:

For the Government:        Julie White, Esq.
                          Assistant United States Attorney
                          United States Attorney's Office
                          P.O. Box 1713
                          Charleston, WV  25326-1713

For the Defendant:        David Schles, Esq.
                          Suite 306
                          815 Quarrier Street
                          Charleston, WV 25301

```
        _____
          Kimberly Kaufman, RMR, CRR, CRC
            Federal Official Court Reporter
          300 Virginia Street East, Room 6610
                  Charleston, WV 25301
```

Proceedings recorded by mechanical stenography; transcript produced by computer.

<u>INDEX</u>

<u>GOVERNMENT WITNESS</u>:                                      <u>PAGE</u>

**SPECIAL AGENT MICHAEL FLEENER**
    Direct Examination (by Ms. White)                15
    Cross-Examination (by Mr. Schles)                40




<u>GOVERNMENT EXHIBIT</u>                              <u>ADMITTED</u>

    Exhibit No. 1.......................................17

1              PROCEEDINGS had before The Honorable Joseph R.

2    Goodwin, Judge, United States District Court, Southern

3    District of West Virginia, in Charleston, West Virginia, on

4    April 29, 2022, at 10:00 a.m., as follows:

5              THE COURT:  Good morning.

6              THE COURTROOM DEPUTY CLERK:  The matter before the

7    Court is *The United States of America v. Raymond Dugan*,

8    Criminal Action No. 2:21-cr-00127.

9              THE COURT:  Is the United States ready to proceed?

10             MS. WHITE:  Yes, Your Honor.

11             THE COURT:  Is the defendant ready?

12             MR. SCHLES:  Yes, Your Honor.

13             THE COURT:  We're here on -- for pretrial motions.

14    We have pending motions to seal and a motion to compel

15    discovery and a motion to suppress.

16        Let's begin with the motion to suppress.

17             MR. SCHLES:  I'm sorry, Your Honor?

18             THE COURT:  Let's begin with the motion to

19    suppress.

20             MR. SCHLES:  Yes, Your Honor.

21             THE COURT:  All right.

22        Ms. White.

23             MS. WHITE:  Your Honor, before the burden shifts

24    to the government to defend its evidence, I believe that the

25    defense needs to make a credible challenge to the search

1    warrant.  And normally we allow the pleadings to stand for

2    that, but in this case I would respectfully request that

3    defense counsel articulate on the record exactly what he is

4    challenging and on what basis.

5        And the reason I ask for that, Your Honor, is that

6    depending on what the issue is it takes us down a different

7    path of what law applies and what exceptions may be debated.

8        For instance, if the argument is simply that the search

9    warrant Judge Tinsley signed lacks probable cause, that

10   could be subject to the *Leon* good faith exception.  However,

11   on the other hand, if Mr. Schles is arguing that Judge

12   Tinsley abandoned his judicial role or the affiant line,

13   well, then *Leon* would not apply in that case.

14       Because the sole purpose of the exclusionary rule is to

15   determine conduct on the part of law enforcement, it's a

16   last resort.  And so we think it's important to know exactly

17   what's being challenged and why before we put a witness on

18   the stand and subject him to cross-examination.

19           THE COURT:  Normally I would let the pleadings

20   stand.  I think you make a good point.  I've read this.

21       Let me just start it this way, Mr. Schles.  The case of

22   *United States v. Bosyk*, 933 F.3d 319, at page 325 from the

23   Fourth Circuit, provides as follows and I quote:

24       The defendant argues that the government obtained its

25   warrant based on a single click of a URL, which they say

1      cannot support a search of somebody's home.

2          We disagree -- ellipses -- in short.  Although the

3      search relied on a single click of an internet link, the

4      click was to a video of child pornography and circumstances

5      suggesting the person behind that click plausibly knew about

6      and sought out that content.

7          We think the magistrate judge, therefore, had a

8      substantial basis for concluding that searching the

9      defendant's address would uncover evidence of wrongdoing.

10         Distinguish that case for me.

11             MR. SCHLES:  Yes, I am, Your Honor.

12         And I believe this case is distinguishable from *Bosyk*

13     because in *Bosyk* the single click was a click that opened a

14     video file, which was documented to contain known child

15     pornography.

16         So while there's a similarity here with the single

17     click aspect of it, here the single click, so to speak, all

18     the government's discovery has shown is that the user of the

19     IP address clicked and -- on May 25th.  I don't have the

20     exact time, but May 25th, 2019, on a single instance.  I

21     believe it was at 1409 UTC, which would be about a little

22     after 9:00 in the morning here -- accessed the -- and we're

23     going to call them the target website and the foreign law

24     enforcement agency today by agreement, Your Honor, rather

25     than the names, but that just simply the home page or the

1    front page of the website was accessed.  There is no

2    evidence in the discovery that any further clicks were found

3    from that IP address, which would have navigated on the

4    target website to any files that would contain any illicit

5    materials.

6              THE COURT:  What does the affidavit say about the

7    website that was accessed by that click?

8              MR. SCHLES:  I'm sorry?

9              THE COURT:  What does the affidavit of the officer

10    say about the target website that was clicked on?

11              MR. SCHLES:  The affidavit says that the target

12    website was at the time of May 2019 operated by the foreign

13    law enforcement agency and that this foreign law enforcement

14    agency, some unidentified person associated with that

15    foreign law enforcement agency, identified the IP address

16    that was ultimately sourced to my client's home in Logan on

17    May 25th, 2019.  It describes things that are found if you

18    navigate through the target website.

19        I would note that in a -- what I would say a vague and

20    general way the affidavit states that users are instructed

21    that they must create a user name and a password in order

22    to -- I think the phrase that they use is to access the

23    majority of the materials on the target website.  There's no

24    evidence in the discovery that my client created a user

25    name, created a password, registered an account.

1          THE COURT:  What does the officer say you get when
2   you click on that website?
3        When you access that website, what does he say about
4   that website that you access in the affidavit?
5        What did the magistrate think that click did?
6        What was given to him?
7          MR. SCHLES:  That takes you to a home page, Your
8   Honor, that is found in the Bates discovery, Your Honor --
9   hold on a second -- Your Honor, it's found at Bates 398 --
10  Dugan Protected 398 to 402.  There are pages that are
11  represented to be screen shots from the target website, Your
12  Honor.
13       Some of the -- it's Russian, which I do not speak, Your
14  Honor, and there's also some English.  There's no child
15  pornography on these pages.  There's no allusion to child
16  pornography.
17         THE COURT:  I'm sorry, Mr. Schles.
18       Take me to the affidavit and tell me what the officer
19  said the click accessed, if anything.
20         MR. SCHLES:  Just a moment.
21       Your Honor, in the affidavit, which begins on Bates
22  page 78, which is identified as page 18 of the affidavit,
23  under heading seven, description of the target website.
24       And it states on paragraph 15:
25       The target website is a known dark website that

1    facilitated the sharing of sexual abuse and exploitation

2    material of -- notably, it does not refer to child

3    pornography at that point.  It says sexual abuse and

4    exploitation material.

5         This dark website contained child sexual abuse and

6    material.  The site was a forum that facilitated the sharing

7    of child sexual abuse --

8              THE COURT:  Slow down a little about.

9              MR. SCHLES:  -- and exploitation material.

10        Users were required to create an account, user name and

11   password in order to access the majority of the material.

12             THE COURT:  The Fourth -- I'm sorry.  I just

13   interrupted you to move along.

14        The Fourth Circuit seems to say the test is did that

15   click plausibly tell the clicker that he was seeking out --

16   or suggest to the Court that the person clicking was seeking

17   out child pornography.

18             MR. SCHLES:  Your Honor, when you take it to my

19   client as a specific individual, there's no evidence in the

20   affidavit whatsoever to support that.  There is no

21   historical evidence of my client being involved in child

22   pornography, of a receiver, a distributor, a viewer.

23   There's no allegations that he has shown any interest in

24   children.

25        There is nothing beyond the fact that an IP address

1    associated with his account was suddenly on a single

2    occasion on a day in May of 2019 accessed a website.  It

3    could have been for a split second, Your Honor.  It doesn't

4    say whether he was on there a tenth of a second or a minute

5    or two minutes or ten minutes.

6              THE COURT:  It's fairly implausible -- you would

7    agree with me it's implausible that someone would hit this

8    website by accident.

9              MR. SCHLES:  I think there's many reasons why --

10   Your Honor, I think it is established that my client had

11   installed the Tor browser, The Onion Router, on his

12   computer, which in layman's terms is a browser that is

13   designed to facilitate anonymity on the internet.

14       And the way it works is essentially it creates a relay

15   system between a user and the website they access.  The

16   information is routed through a series of intermediary or

17   relay computers that are operated by volunteers on the Tor

18   network.  And the purpose of this is that the website does

19   not see the user's IP address and the user cannot see the

20   dark website's IP address.

21       The affidavit speculates -- and it's pure

22   speculation -- that someone must be seeking child

23   pornography in order to find this website.  And I think they

24   used the phrase could not stumble upon it.  But, Your Honor,

25   people stumble across things on the regular internet and the

1    dark website daily.  You don't necessarily have to type in a

2    random series of letters and numbers.

3       Oftentimes, when you're on the internet, there are

4    links in forms, on other websites, you get pop-up windows.

5    All sorts of things that someone could inadvertently click,

6    be directed to that target website.  And that's all we have

7    is one instance of the target website.  There's no record

8    whatsoever of any activity from the target -- from my

9    client's computer on the target website.  There's no

10   evidence.

11              THE COURT:  Here didn't the foreign law

12   enforcement agency actually say in the information they

13   provided and doesn't the affidavit say that that address was

14   used to access online child sexual abuse and exploitation

15   material?

16              MR. SCHLES:  It doesn't say that was done by my

17   client.  It says that that is the purpose of the website,

18   but there's no -- no representation in the affidavit that my

19   client -- and I believe it's IP address 173.80.229.219.

20   There's nothing in the affidavit that says the computer user

21   using that IP address did anything involving child

22   pornography on the target website.  There's just general

23   language concerning what could be found on the website by

24   people who did register.

25              THE COURT:  Stop.

1        How is that different from *Bosyk?*

2              MR. SCHLES:  Well, I think the difference in *Bosyk*

3    is the single click did go to a video file that -- and it's

4    described and there's no question that that was child

5    pornography.  It discusses a male from the waist down with

6    what appears to be a minor.  I think it's just the lower

7    body of a younger person and sexual activity.

8              THE COURT:  All right.

9              MR. SCHLES:  In a video here we just have --

10             THE COURT:  Okay.  Okay.

11       Ms. White.

12             MS. WHITE:  Your Honor, thank you.

13       I think it's important to clarify a couple of things

14   that Mr. Schles has said at the outset.  The Tor network

15   does not work like the regular internet that you and I --

16             THE COURT:  I understand it for whatever that's

17   worth.

18             MS. WHITE:  I just wanted to clarify that there is

19   no Google search.  There's no index.  And so --

20             THE COURT:  And you said that in your papers.

21             MS. WHITE:  Yes, Your Honor.

22       Thank you.

23             THE COURT:  Yes.

24             MS. WHITE:  And when Mr. Schles discusses "my

25   client," there's no link to his client, well, we're here

1    litigating a search warrant for the residences that the IP

2    address came back to, so we don't need to link it to

3    Mr. Dugan specifically.  We need to link it to the home.

4    And there's been no challenge between the IP address and

5    that residence.  So for that I don't think there's anything

6    more that the government needs to address on that.

7         But when you look at the information provided by the

8    foreign enforcement agency, it says on -- excuse me, Your

9    Honor -- 2019, 5/25, IP address was used to access online

10   child sexual abuse and exploitation material.

11        That was what was provided by the foreign law

12   enforcement agency to the FBI and then forwarded on to

13   Homeland Security to begin this particular investigation.

14             THE COURT:  Okay.  Stop there.

15             MS. WHITE:  Uh-huh.

16             THE COURT:  What's the difference there,

17   Mr. Schles, from the --

18             MR. SCHLES:  Well --

19             THE COURT:  Let me finish.  You're very anxious

20   this morning.

21        What's the difference there from when a reliable

22   informant has provided information to the FBI in the past

23   and provides information now that he saw cocaine on a card

24   table?

25             MR. SCHLES:  Well, the difference in my opinion

```
1     quite simply is that representation is false.  There is no

2     evidence in the discovery that the user of that IP address

3     did, in fact, access child exploitation and abusive

4     material, child pornography, child erotica.  There's no

5     evidence that accessed anything but the home page of the

6     target website, which does not display any of that.

7               THE COURT:  Hang on just a minute.

8          We're looking for probable cause to do a search of a

9     computer that accessed a website, which I don't think

10    there's any dispute, was home to child pornography; is that

11    right?

12              MR. SCHLES:  Correct.

13              THE COURT:  Isn't that what the foreign law

14    enforcement said?

15              MR. SCHLES:  I'm sorry, Your Honor?

16              THE COURT:  Didn't foreign law enforcement say

17    that the computer located at the Dugan residence was used to

18    access a website which was the home for child pornography?

19              MR. SCHLES:  I -- I believe Mr. Fleener did put

20    that in his affidavit, Your Honor, but I don't believe it's

21    correct.

22         And if we get as far as to Leon good faith analysis, I

23    think we will be looking at whether the affidavit contained

24    materially false information that may have misled the

25    magistrate into believing that the user of the IP address
```

1    did access child pornography or child exploitation and abuse

2    material when there is actually no evidence that that

3    happened.

4            THE COURT:  I tell you what we're going to do.

5    I'm going to put the government to its burden.

6        Go forward.

7            MS. WHITE:  Yes, Your Honor.

8        May I start with argument prior to calling a witness or

9    would you like argument at the end?

10           THE COURT:  I'd just as soon hear the witnesses

11   and then the argument.

12           MS. WHITE:  Yes, sir.

13       Your Honor, just so we're clear we're not proceeding

14   into a Franks hearing at this time?

15           THE COURT:  You absolutely are not.

16           MS. WHITE:  Thank you, sir.

17       I call Agent Fleener.

18           THE COURT:  I'm just interested in addressing this

19   motion.

20           MS. WHITE:  Yes, Your Honor.

21       (Witness sworn.)

22           THE COURT:  Do you need some water?

23           MS. WHITE:  Your Honor, I have bronchitis, but I'm

24   on antibiotics.

25       I apologize.

Special Agent Michael Fleener - Direct (White)

1        THE COURT:  Do you have any water there or

2   anything?

3        MS. WHITE:  Oh, no.  I'm fine, sir.

4     Thank you.

5   **SPECIAL AGENT MICHAEL FLEENER, GOVERNMENT WITNESS, SWORN**

6                   **DIRECT EXAMINATION**

7   BY MS. WHITE:

8   **Q.**   Agent, could you state your name and employer for the

9   for the record, please?

10  **A.**   My name is Michael D. Fleener, and I'm a special agent

11  with the Department of Homeland Security, Homeland Security

12  Investigations.

13  **Q.**   And how long have you been in law enforcement?

14  **A.**   Approximately 28 years.

15  **Q.**   Is one of your responsibilities to investigate child

16  exploitation and child pornography cases?

17  **A.**   Yes, ma'am, it is.

18  **Q.**   Were you involved in the investigation into the

19  defendant in this case, Raymond Dugan?

20  **A.**   Yes, ma'am, I was.

21  **Q.**   I'm sorry?

22  **A.**   Yes, ma'am, I was.

23  **Q.**   And were you the affiant in the federal search warrant

24  for the residence of Mr. Dugan on ███████████████

25  here in Logan County, West Virginia?

*Kimberly Kaufman, RMR, CRR, CRC (304) 347-3188*

Special Agent Michael Fleener - Direct (White)

1    **A.**   Yes, ma'am, I was.

2    **Q.**   And that warrant was executed on June 11th of 2020?

3    **A.**   Correct.

4         MS. WHITE:  Your Honor, may I approach the

5    witness?

6         THE COURT:  Yes.

7         MS. WHITE:  Your Honor, I don't believe there's

8    any objection to Government's Exhibit 1 being received under

9    seal, but we can authenticate it if Mr. Schles would like us

10   to.

11        THE COURT:  All right.

12        MR. SCHLES:  Yes, Your Honor.

13        THE COURT:  That motion to seal is granted.

14        MS. WHITE:  Thank you.

15   BY MS. WHITE:

16   **Q.**   Agent, what is Government's Exhibit No. 1?

17   **A.**   It's my application for a search warrant.

18   **Q.**   Does that packet include your affidavit?

19   **A.**   Yes, ma'am, it does.

20   **Q.**   Okay.  Does that packet fairly and accurately depict

21   what you presented to Judge Tinsley in June of 2020?

22   **A.**   Yes, ma'am, it does.

23        MS. WHITE:  Okay.  We'd offer Government's 1 into

24   evidence, Your Honor.

25        THE COURT:  It may be received.

 1              **GOVERNMENT EXHIBIT NO. 1 ADMITTED UNDER SEAL**

 2              MR. SCHLES:  No objection.

 3     BY MS. WHITE:

 4     **Q.**   Now, you executed that search warrant and you seized

 5     some electronics; is that correct?

 6     **A.**   That is correct, ma'am.

 7     **Q.**   And Mr. Dugan was interviewed on that date as well,

 8     correct?

 9     **A.**   Correct.

10     **Q.**   Was he given his Miranda warnings?

11     **A.**   Yes, ma'am, he was.

12     **Q.**   Did he freely and voluntarily waive those?

13     **A.**   Yes, ma'am, he did.

14     **Q.**   Did he make any statements admitting to visiting

15     multiple child pornography websites?

16     **A.**   Yes, ma'am, he did.

17     **Q.**   He indicated that he searched for it; is that right?

18     **A.**   That is correct.

19     **Q.**   Okay.  With respect to the search warrant itself, could

20     you pull out page 1 of the affidavit.  We're just going to

21     walk through it line-by-line with the Court's indulgence.

22     **A.**   Okay.

23     **Q.**   If you just put it right down here.

24     **A.**   There you go.  I'm sorry.

25     **Q.**   We'll go through this first part rather quickly.

Special Agent Michael Fleener - Direct (White)

1        The first part of your affidavit is obviously the

2   introduction; is that correct?

3   **A.**   That is correct, ma'am.

4   **Q.**   And paragraph 1 talks about your background and

5   qualifications with investigations involving the sexual

6   exploitation of children; is that right?

7   **A.**   Yes, ma'am, it is.

8   **Q.**   What's that based upon?

9   **A.**   My work history, work experience.

10        THE COURT:  I'm fine with the officer's

11   qualifications to testify about this.

12        MS. WHITE:  Thank you, Your Honor.

13   BY MS. WHITE:

14   **Q.**   So we'll move forward to paragraph six, which is under

15   heading five, background of the investigation and probable

16   cause.

17   **A.**   I apologize.  I'm going to get this all out of order.

18        THE COURT:  What page is it on?

19        MS. WHITE:  Your Honor, we're going to pull it up

20   here in just a second for you.

21        THE WITNESS:  Perfect.

22        THE COURT REPORTER:  Ms. White?

23        MS. WHITE:  Yes.

24        THE COURT REPORTER:  Is your microphone on?

25        THE COURT:  I'm sorry.  I can't hear you.

Special Agent Michael Fleener - Direct (White)

1           MS. WHITE:  Is my microphone on?

2        Yes, ma'am.

3           THE COURT REPORTER:  Can you angle it a little bit

4    more towards you?

5           MS. WHITE:  Is that better?

6        I'm sorry.

7           THE COURT:  It's all right.

8    BY MS. WHITE:

9    **Q.**   Now, paragraph six of that affidavit, Agent Fleener,

10   that provides an overview of your investigation; is that

11   correct?

12   **A.**   That is correct, ma'am.

13   **Q.**   Where does the information in that paragraph come from?

14   **A.**   My training and experience, conversations with other

15   law enforcement agencies and officers.

16        Excuse me.

17   **Q.**   The next heading, heading six, is called the Tor

18   network.  And I think that's where we start to get into the

19   issue we're here today for.

20        Paragraphs seven through fourteen, those provide a

21   background on Tor and its hidden services, as well as the

22   fact that hidden services aren't indexed; is that right?

23   **A.**   That is correct, ma'am.

24   **Q.**   Okay.  And where do you base that knowledge from?  What

25   made you put that in the affidavit?

Special Agent Michael Fleener - Direct (White)

1   **A.**   A mixture of my training and experience, my familiarity

2   with the Tor network, some information gathered from the

3   Department of Justice, Child Exploitation and Obscenity

4   Center -- or Services, excuse me.

5   **Q.**   Let me stop you there.  That's commonly referred to as

6   CEOS, correct?

7   **A.**   Correct, ma'am.

8   **Q.**   The Department of Justice --

9           THE COURT REPORTER:  Excuse me --

10  BY MS. WHITE:

11  **Q.**   It's the Department of Justice --

12          THE COURT REPORTER:  No, I'm sorry.  Can you

13  please wait for him to finish his answer before you ask the

14  question?

15          MS. WHITE:  Yes, ma'am.

16          THE COURT:  It's hard to understand you,

17  Ms. White, because of the mask.

18          MS. WHITE:  I'm sorry, Your Honor.

19          THE COURT:  If you would slow down --

20          MS. WHITE:  Okay.

21          THE COURT:  -- I think it will help.

22          MS. WHITE:  Yes, Your Honor.

23  BY MS. WHITE:

24  **Q.**   Agent Fleener, you just referenced what organization?

25  **A.**   The Department of Justice, Child Exploitation and

Special Agent Michael Fleener - Direct (White)

1    Obscenity Services, I believe -- or Section, I'm sorry --

2    Obscenity Section.

3    **Q.**   And we refer to that as the acronym CEOS; is that

4    correct?

5    **A.**   Correct, CEOS.  C-E-O-S.

6    **Q.**   And CEOS is a branch of DOJ that specifically deals

7    with these types of investigations; is that right?

8    **A.**   That is correct, ma'am.

9    **Q.**   Did CEOS provide you a template for the affidavit you

10   submitted in this case?

11   **A.**   Absolutely, ma'am.  It was the bulk of the application.

12   **Q.**   So you used as the starting point for your affidavit

13   that was submitted a rather large and detailed document from

14   CEOS, correct?

15   **A.**   That is correct, yes.

16   **Q.**   So when we get to Section seven, description of the

17   target website, and Section eight, evidence related to

18   identification of the target, paragraphs fifteen through

19   twenty-one provide a description of that target website,

20   correct?

21   **A.**   That is correct.

22   **Q.**   And it also says that the site was located abroad?

23   **A.**   Correct.

24   **Q.**   Describes the content available to the site --

25   **A.**   Yes.

Special Agent Michael Fleener - Direct (White)

1   **Q.**   -- correct?

2   **A.**   Yes, ma'am.

3   **Q.**   And how visitors were able to access the site; is that

4   right?

5   **A.**   That is correct.

6           MS. WHITE:  I'm going to approach the witness --

7           THE COURT:  You may.

8           MS. WHITE:  -- to change the page.

9   BY MS. WHITE:

10  **Q.**   Now, specifically, Agent, paragraph 21, could you read

11  that for the Court, please?

12  **A.**   Yes, ma'am.

13          In August 2019 a federal law enforcement agency

14  referred herein --

15          THE COURT:  Slow, slow, slow.

16          THE WITNESS:  I'm sorry, sir.

17          THE COURT:  That's all right.

18  **A.**   In August 2019 a foreign law enforcement agency

19  referenced herein as FLA, known to the FBI and with a

20  history of providing reliable accurate information in the

21  past, notified the FBI that this foreign law enforcement

22  agency determined that on May 25th, 2019, at 14:09:59

23  universal time IP address 173.80.229.219 was used to access

24  online child sexual abuse and exploitation material via a

25  website that the foreign law enforcement agency named -- I

1   beg your pardon -- and described as the target website.

2   Foreign law enforcement agency described the website --

3           THE COURT:  I've read all this.

4           MS. WHITE:  Okay.

5           THE COURT:  Go ahead.

6           MS. WHITE:  Thank you, Your Honor.

7   BY MS. WHITE:

8   **Q.**   Agent Fleener, you're familiar with the documentation

9   that came from the foreign law enforcement agency; is that

10  correct?

11  **A.**   Yes, ma'am, I am.

12  **Q.**   Is the information in paragraph 21 essentially verbatim

13  on what the foreign law enforcement agency told you?

14  **A.**   Yes, ma'am, it is.

15  **Q.**   Do you have any reason to doubt the veracity?

16          MR. SCHLES:  Objection.  Irrelevant.

17          MS. WHITE:  Well, Your Honor, it certainly goes to

18  relevance.  If the affiant believed what the law enforcement

19  officer told him, that is relevant.  If he didn't, we're in

20  a whole nother ballpark.

21          THE COURT:  I will allow the answer.

22          MS. WHITE:  Thank you.

23          THE COURT:  Go ahead.

24  BY MS. WHITE:

25  **Q.**   Do you have any reason to doubt the veracity of the

1   information you received from the foreign law enforcement

2   agency?

3   **A.**   No, ma'am, I do not.

4   **Q.**   Now, the foreign law enforcement agency did not turn

5   over to the United States the details of its investigation,

6   did it?

7   **A.**   No, it did not.

8   **Q.**   So we don't have any additional information to provide

9   about how far this IP address accessed the website, do we?

10   **A.**   No, we do not.

11   **Q.**   But we do know that they use the words, quote, was used

12   to access online child sexual abuse and exploitation

13   material, correct?

14   **A.**   Yes.  Yes, ma'am.

15          MS. WHITE:  With the Court's indulgence.

16   BY MS. WHITE:

17   **Q.**   Now, that affidavit goes on to describe how a Tor user

18   could access a hidden service like the target website; is

19   that correct?

20   **A.**   Yes, ma'am.

21   **Q.**   And then the warrant goes on to explain the nexus

22   between criminal conduct and the place to be searched.

23   That's in section nine, correct?

24   **A.**   Correct, ma'am.

25          MS. WHITE:  I don't believe there's been any

Special Agent Michael Fleener - Direct (White)

1   challenge to anything past where we've gotten thus far, Your

2   Honor.

3   BY MS. WHITE:

4   **Q.**   So with that did you ever speak with anyone in the

5   foreign law enforcement agency directly?

6   **A.**   No, ma'am, I did not.

7   **Q.**   Did you ever access the defendant's computer during the

8   foreign law enforcement agency's investigation?

9   **A.**   Can you repeat that?  I missed the first part.

10  **Q.**   Did you ever access the defendant's computer during the

11  investigation while he was on the website?

12  **A.**   No, ma'am, I did not.

13  **Q.**   Are you aware of the defendant's allegation that the

14  foreign law enforcement agency hacked into his computer?

15          MR. SCHLES:  Objection, Your Honor.

16      That's misrepresenting my motion.  In the government's

17  response, they repeatedly used the loaded phrase hacked

18  into.  In -- in my --

19          THE COURT:  What evidence or factual basis is

20  there for the assertion of the defendant in briefing that

21  the foreign law enforcement agency or anyone accessed this

22  computer?

23          MR. SCHLES:  Your Honor, that is based on the way

24  the Tor network operates.

25          THE COURT:  No.  I'm asking what evidence is there

1    that they accessed his computer?

2            MR. SCHLES:  The fact that they obtained the IP

3    address when this communication between the IP address

4    173.80.229 --

5            THE COURT:  You don't need to keep rattling that

6    off --

7            MR. SCHLES:  And --

8            THE COURT:  Mr. Schles, slow down.  I'm going to

9    ask a lot of questions and I need short answers, okay?  If I

10   need an explanation, I'm going to do it.

11      If I access any website, don't they receive my IP

12   address?

13           MR. SCHLES:  Not when one uses The Onion Router or

14   Tor network, Your Honor.

15           THE COURT:  The website does not receive my IP

16   address.

17      Does any computer in the chain or in the web receive --

18           MR. SCHLES:  The first --

19           THE COURT:  -- my IP address?

20           MR. SCHLES:  The first computer in the chain from

21   the user gets that address.

22           THE COURT:  Now, does that computer or any other

23   computer in the Tor network then access the user's IP

24   address just because they accessed another address in the

25   Tor network?

1      In other words, is there some kind of automatic

2  reciprocity in access?

3      MR. SCHLES:  Your Honor, the IP address is

4  broadcast only to the first relay computer; then it goes

5  through multiple, multiple random relay computers.  By the

6  time it reaches the target website, there is no

7  identification possible simply by being the operator of the

8  target website.  Some mechanism or method must have been

9  utilized; otherwise, it would be an impossibility for the

10  FLA to have the IP address.

11      THE COURT:  Is there any evidence that the only

12  way to get the IP address was unlawful?

13      MR. SCHLES:  I'm sorry, by what?

14      THE COURT:  Is there evidence that you have that

15  the only way to get your client's IP address was by unlawful

16  means?

17      MR. SCHLES:  Your Honor, I actually don't because

18  they won't disclose -- that's where the motion to compel

19  comes in.  On the one hand, when you don't have any

20  evidence, but, B, we're not going to tell you how we did it.

21  You just have to take our word that we didn't do anything

22  else.  And I can't prove a negative, no, Your Honor.

23      THE COURT:  It seems simpler to me right now --

24  and I need you to persuade me otherwise.  It seems to me

25  this is like having a reliable confidential informant in a

1    foreign law enforcement agency that's proven reliable in the

2    past and provides information that your client's address --

3    that computer at that address accessed a known child

4    pornography home site.

5              MR. SCHLES:  I -- I -- I'm not disputing that this

6    foreign law enforcement agency does as a matter of custom

7    and practice collaborate with United States law enforcement,

8    cooperate with United States law enforcement and share

9    intelligence with United States law enforcement.  That's not

10   the portion that I'm challenging the reliability.

11      I am challenging their statement that they didn't do

12   anything to virtually enter my client's computer and obtain

13   the IP address through the use of what they euphemistically

14   call network investigatory techniques, which does not sound

15   to an untrained layman as if that would be a code that is

16   transmitted to the other computers and presumably back to at

17   least the first relay computer, but they -- they refuse to

18   disclose basically saying it's classified so --

19              THE COURT:  If they got his IP address from some

20   other computer, then he wouldn't have any standing to

21   challenge that, would he?

22              MR. SCHLES:  I -- I -- I would agree that my

23   client only has a right to privacy in his own property, not

24   the property of others, Your Honor.  I would not challenge

25   that.

1          And if the government did, in fact, obtain the IP

2     address through getting it off of some other source than my

3     client's computer, they should be required to disclose that

4     so that it can be examined.  It's basically you have to take

5     our word.  And it's not even their word.  It's the word of

6     an unidentified individual with a foreign law enforcement

7     agency.  The history between the foreign law enforcement

8     agency I don't doubt.  This particular individual, we don't

9     know whether he's reliable.  We don't know whether he's

10    competent.  We don't know anything.

11          THE COURT:  Magistrate judges and judges issuing

12    warrants rarely know if the representations from an

13    established law enforcement officer making an affidavit who

14    swears on an oath that the information I received is from a

15    source who has proven reliable in the past.  That's

16    essentially what they're saying about this foreign law

17    enforcement agency.  And they say that this is the

18    information they gave us.

19          Now, that's what they relied on and that's what the

20    magistrate judge relied on since he relied on the affidavit.

21          Your point is that it must be a lie?

22          It's of necessity a lie?

23          MR. SCHLES:  It's not a lie.  There's nothing

24    false.

25          THE COURT:  Well, then, why isn't it sufficient as

1     a basis for probable cause?

2          MR. SCHLES:  Essentially what the foreign law

3     enforcement agency says is that they are from a nation with

4     a rule of law, which we're not going to say what the nation

5     is, but I would not contest that representation, and that it

6     did not violate the laws of that nation.

7          It doesn't talk about whether or not they violated the

8     Fourth Amendment rights of my client in the privacy of his

9     computer in his home.

10         And my position would be if --

11         THE COURT:  What is your -- other than what you've

12    said so far, what is your basis for saying that?

13         MR. SCHLES:  Independent investigation and -- and

14    reading about various government operations that have been

15    conducted in very similar circumstances where foreign law

16    enforcement agencies working in concert with United States

17    law enforcement essentially use an unknown source code to --

18    and I don't -- I'm not a computer expert so I may be using

19    the wrong word, but to cause a user's computer to display

20    the IP address when otherwise it would not.

21         THE COURT:  All right.  Let me let Ms. White

22    respond to this.

23         I understand.  I don't see any factual basis for what

24    you're saying, but I understand it.

25         MS. WHITE:  Well, Your Honor, that's the

1    government's argument.  This is pure speculation on

2    Mr. Schles's part.  He has nothing to support it.  He has no

3    paperwork, no witness, no affidavit, nothing.

4         What he has done is taken an argument that's presented

5    in other courts -- one in the District of Massachusetts and

6    one in the Eastern District of Virginia -- making the same

7    argument on behalf of defendants who were also caught up

8    using these same target websites in this investigation.

9         Those all failed.

10             THE COURT:  What courts were those and what did

11    the judges say?

12             MS. WHITE:  Your Honor, they both -- for the

13    motion to suppress, *U.S. v. Zachary Ellis Sanders* was in the

14    Eastern District of Virginia.  And the judge said that there

15    was probable cause in the warrant.

16             THE COURT:  What did -- what did the judge --

17    what's the judge's name and what did he say, if you have it?

18             MS. WHITE:  Yes, Your Honor.  I can, with the

19    Court's indulgence, pull out the opinion for you.

20             THE COURT:  Take your time.

21             MS. WHITE:  These arguments -- excuse me.

22         These memorandums and order were filed under seal in

23    those courts, so I don't believe Mr. Schles has had an

24    opportunity to see them.  I can -- I have one copy I can

25    provide --

1              THE COURT:  Is the judge's order under seal?

2              MS. WHITE:  It's a sealed memorandum order.

3              THE COURT:  Huh.

4              MS. WHITE:  The -- these cases were put under seal

5      across the country and subject to protective orders.  So any

6      documentation that was filed by the Court or party that had

7      any sensitive information it was sealed.  And so in this

8      case, because there was a debate over the probable cause

9      that was addressed by the Court, the judges put those under

10     seal as well.

11          May I approach?

12              THE COURT:  You may.

13          I find this entirely odd.

14              MS. WHITE:  Well, while I don't want to go off on

15     a tangent, Your Honor, I'm simply trying to say that

16     Mr. Schles has taken an argument some other defense

17     attorneys have tried but without any factual support and

18     other courts have said no.

19          Now we're getting to where I thought we were going to

20     get to, which is we're talking about something totally

21     different than what's pled in the motion, but to address the

22     fact of the Fourth Amendment right to privacy with an IP

23     address, the defendant doesn't have a right to privacy.

24          The Fourth Amendment does not apply.  And I would cite

25     the Court, *United States v. Farrell*.  It's 2016 WL 705197:

1     A Tor user lacks any reasonable expectation of privacy

2     in that IP address information because it voluntarily shared

3     it with a third-party.

4          So Mr. Schles's claim that we violated his client's

5     Fourth Amendment right by taking his IP address, it's just

6     contrary to what the case law says.

7          In addition, Mr. Schles knows and --

8               THE COURT:  I'm going to give these sealed orders

9     back to you.  I don't want them.

10              MS. WHITE:  Thank you, Your Honor.

11         In addition to knowing what the tip said, we also know

12    that the foreign law enforcement agency worked within the

13    confines of its own law -- and that's been provided to

14    defense counsel at Dugan Protected 397 -- that they took the

15    appropriate steps.

16         And I would respectfully remind the Court that a law

17    enforcement officer's not treated like an anonymous

18    confidential informant.  And I think that the Court has

19    already alluded to that this morning, but just for the

20    purposes of the record we would point to *Yusuf*, 461 F.3d

21    374.  And that says there's a distinction between

22    information provided by an informant and that provided by a

23    law enforcement officer or a government agency.

24         So while I respect the fact that Mr. Schles wishes he

25    had more information about the foreign law enforcement

1    agency's activities, that doesn't mean he's entitled to it

2    and it doesn't mean that Judge Tinsley signed a warrant

3    without sufficient probable cause.

4            THE COURT:  All right.  Anything that you want to

5    say further on that?

6            MR. SCHLES:  Your Honor, I mean, we're kind of

7    broaching the motion to compel in an unconventional manner

8    here.  I believe I do have a right to know what the evidence

9    is against my client and how it was obtained.

10       So for the purpose of this, for a motion to suppress,

11   on the basis that someone --

12           THE COURT:  If I understand it, and fill me in if

13   I got this wrong, the evidence is that he received the

14   information he said he did in the affidavit from the foreign

15   law enforcement agency and on that hearsay basis presented

16   that to Judge Tinsley who found that was sufficient for

17   probable cause?

18           MR. SCHLES:  That is correct, Your Honor.

19           THE COURT:  All right.  And you believe because it

20   is hearsay evidence you need to have the original speaker

21   present direct evidence before it could be relied upon by

22   the magistrate?

23           MR. SCHLES:  I believe there needs to be some form

24   of corroboration not necessarily in that manner, but there

25   needs to be something more than someone, we won't tell you

1    who he is, obtained something in a way that we won't tell

2    you how it was done, but trust us your client's rights were

3    scrupulously observed.

4         I mean, it's a catch-22 situation.  I can't put on

5    proof because they won't disclose it.  And then they use my

6    lack of proof as a hammer against me.

7              THE COURT:  I don't think that's the case, at

8    least that's not the way I understand it.

9         The way I understand it is this is very much like a

10   confidential informant who has proved reliable in the past

11   and whom the officer suggests to the magistrate judge has

12   provided information that is sufficient for probable cause

13   to issue a search warrant.

14        What's the difference between this case and that?

15             MR. SCHLES:  Well, I -- I'm not agreeing with you

16   that the information provides sufficient probable cause, but

17   in addressing that, the difference is that when you're

18   talking about, you know, your typical informant, they

19   don't necessarily disclose the identity to the magistrate

20   who issues or they're seeking the warrant from, but there

21   has to be some basis for finding it reliable and also there

22   is no, generally, allegation that they are relying on

23   information that informant illegally obtained from the

24   target of the search warrant.

25             THE COURT:  There is no evidence here except your

1    argument that it was illegally obtained.  And your argued

2    basis for that, which is your understanding of how Tor

3    networks operate, if -- I'm -- I'm not persuaded by your

4    argument.

5         Do you have anything else to offer?

6         MS. WHITE:  Your Honor, we would just simply note

7    that there was additional information about the reliability

8    of the foreign law enforcement agency.

9         THE COURT:  I understand.  I have everything

10   that's in the affidavit.  I know what Judge Tinsley saw.

11       Is there any other question I haven't addressed that

12   you think I should with regard to the affidavit, Mr. Schles?

13       MR. SCHLES:  Your Honor, I believe that my client

14   has the right and, you know, due process demands that he be

15   permitted to get more than here is the entirety of the

16   communications from the foreign law enforcement agency,

17   several paragraphs with boilerplate language.

18       And I should probably put this in the record rather

19   than just reading it, Your Honor, but basically:  NCA

20   Intelligent Report.  On 2019, 5/25, 14:09:59, UTC --

21       THE COURT REPORTER:  I'm sorry --

22       THE COURT:  Go slower.  14 what?

23       MS. WHITE:  We have no objection to that --

24       MR. SCHLES:  14:09:59.  That's -- that's a time --

25   the IP address which we're talking about was used to access

1    online sexual abuse and exploitation material.

2              THE COURT:  It says that?

3              MR. SCHLES:  It says that, but it's not true.  At

4    least there's no evidence that it's true.  The --

5              THE COURT:  How do we distinguish that?

6         And I'm only going to ask it this last time because

7    I'm -- I know I'm beating a -- maybe not a dead horse, but

8    one that's on life support.

9         How is that different than a confidential informant

10   who's proved reliable time after time after time?

11        And here we've got an established law enforcement

12   agency of a country that I think you would concede is a

13   country that is a nation of law.

14        How is that police agency not better than the

15   confidential informant who's proved reliable?

16             MR. SCHLES:  It may well be, but we don't know.

17             THE COURT:  But if I'm the magistrate judge and

18   I'm looking at it and I'm allowed to consider confidential

19   information, hearsay, why is that not sufficient?

20             MR. SCHLES:  Because it is misleading in that it

21   would lead a reasonable magistrate who is reading the

22   affidavit to believe that that IP address was, in fact, used

23   to access child exploitation and sexual abuse material when

24   there was no evidence provided by the foreign law

25   enforcement agency that happened.

1        The only evidence the FLA provided was specifically

2   that, that on May 25th, 2019, that address accessed the home

3   page of the target website for an undetermined period of

4   time.

5        There's no child pornography.  There's no images.

6   There's no videos.  It's just words on a screen at that

7   point.  And they're not even words about child pornography.

8        And they go to great lengths to say, oh, you have to

9   register.  There's no evidence whatsoever that that

10  happened, but the affidavit, the way it's written, it talks

11  about users are required to do this and they're required to

12  create a user name and they're required to create a password

13  and they're required to upload materials, that's speaking

14  generally.  There's no evidence that my client or anyone

15  using that computer did any of those things, but the

16  affidavit was artfully constructed to create the impression.

17       There's also descriptions of things that are from the

18  descriptions clearly child pornography that were found on

19  that website on an undisclosed time, not necessarily the

20  time my client accessed it.  And there's literally zero

21  reason to believe that my client accessed any of the files

22  described in the affidavit, but my position is the affidavit

23  was artfully constructed to lead a person reading it to

24  believe that is what happened when it's not.  And I believe

25  it was deliberately by design --

```
1              THE COURT:  Are you suggesting that the officer --
2     the hearsay rule doesn't apply, but is there -- are you
3     suggesting the officer didn't have a substantial basis for
4     crediting the hearsay from the foreign law enforcement
5     agency as credible?
6              MR. SCHLES:  I think he had substantial basis to
7     credit one thing, that on May 25th, for an undetermined
8     period of time, which could have been a split second, that
9     IP address accessed the target website.  Beyond that there
10    is nothing.
11             THE COURT:  All right.
12             MS. WHITE:  Well, Your Honor, just so we're clear,
13    that's not what the information says.
14        So Mr. Schles has agreed to half of what the
15    information says.
16        What the information says was that that IP address was
17    used to access online child sexual exploitation and abuse
18    material.
19             THE COURT:  I quoted that to him before.
20             MR. SCHLES:  And so Mr. Schles keeps saying, well,
21    he only went to the first page.  That's not what the
22    information is.
23        I would just put on record -- and I know the Court's
24    aware -- we're arguing about probable cause for a search
25    warrant.
```

Special Agent Michael Fleener - Cross (Schles)

1         What Mr. Schles seems to want is every detail in an

2    investigation that has nothing to do with what his client is

3    charged with.

4              THE COURT:  There's no constitutional right to the

5    discovery.

6              MS. WHITE:  Thank you, Your Honor.

7              THE COURT:  What I need to know, I'll probably ask

8    you.  And I do read this stuff.

9         Okay.  Anything else?

10             MS. WHITE:  Not on the motion to suppress, Your

11   Honor.

12             THE COURT:  All right.

13        Mr. Schles, anything else?

14             MR. SCHLES:  May I question the witness?

15             THE COURT:  Huh?

16             MR. SCHLES:  May I cross-examine the witness?

17             THE COURT:  Oh, sure.

18             MR. SCHLES:  Thank you, Your Honor.

19             THE COURT:  Sure.  On the direct testimony he's

20   offered.

21                        **CROSS-EXAMINATION**

22   BY MR. SCHLES:

23   **Q.**   Agent Fleener, I believe you stated on direct you --

24   you never communicated with the foreign law enforcement

25   agency?

Special Agent Michael Fleener - Cross (Schles)

1   **A.**   That is correct, sir.

2   **Q.**   Is your understanding the foreign law enforcement

3   agency first contacted the United States FBI?

4   **A.**   From what I understand, that's correct.

5   **Q.**   And the FBI notified Homeland Security, Boston?

6   **A.**   Correct.

7   **Q.**   And then when, I guess just from a general sense, it

8   was determined that the IP address was located in West

9   Virginia, that's when it was referred to you?

10  **A.**   That is correct, sir.

11  **Q.**   So that's when you came into the picture?

12  **A.**   Yes, sir.

13  **Q.**   And you obtained an administrative subpoena from

14  Suddenlink and one from AEP, which identified the account

15  holders for Suddenlink, obviously the IP address, and AEP I

16  guess was corroborating that the same name was on the power

17  bill for the home in Logan County as was on the Suddenlink

18  account, correct?

19  **A.**   Correct, with one minor correction on the record.  The

20  FBI actually subpoenaed Suddenlink and then forwarded me

21  that information when I got the initial lead.  That

22  Suddenlink subpoena and response came to me with the initial

23  lead.

24  **Q.**   Okay.

25  **A.**   I did issue a subpoena to AEP.

*Kimberly Kaufman, RMR, CRR, CRC (304) 347-3188*

1    **Q.**   And once you had an -- and it was Eleanor Dugan,

2    Mr. Dugan's wife, who was the account holder for Suddenlink

3    and for AEP, correct?

4    **A.**   That is correct, sir.

5    **Q.**   And you obviously had the street address of the home?

6    **A.**   Yes, sir.

7    **Q.**   And did you have any information concerning the

8    activity of IP address 173.80.229.219, any information that

9    you personally were involved in on May 25th, 2019, or at any

10   other time in relation to the target website?

11   **A.**   Other than what was sent to me by the FLA and FBI, no.

12   **Q.**   And so you basically received a short blurb that was

13   forwarded to you that stated that IP address was, quote,

14   used to access online child sexual abuse and exploitation

15   material?

16            THE COURT:  Go back to the beginning of your

17   reading there.  Go back to the beginning of your reading of

18   that and read it slower.

19            MR. SCHLES:  I'm sorry.

20   BY MR. SCHLES:

21   **Q.**   The only information that you had was from this that

22   was forwarded to you that the IP address was used to access

23   online child sexual abuse and exploitation material.  This

24   site was a forum that facilitated the sharing of child

25   sexual abuse and exploitation material, correct?

1   **A.**   Correct.

2   **Q.**   At the time you completed the affidavit you had done no

3   investigation of that website, had you?

4   **A.**   No, not the investigation.  I looked over material that

5   was forwarded to me regarding that website.

6   **Q.**   Did any of that material include any activity by that

7   IP address on the target website?

8   **A.**   Other than what you're holding in your hand not

9   specifically, no.

10   **Q.**   And did you make any effort to obtain information from

11   any other source to corroborate that?

12   **A.**   No, I did not.

13   **Q.**   And you also were informed that users were required to

14   create an account, parenthetical user name and password, in

15   order to access the majority of the material.

16        That is your understanding?

17   **A.**   Did I understand that?

18   **Q.**   Is it your understanding that --

19   **A.**   Oh, yes, sir.

20   **Q.**   -- users were required to create an account?

21   **A.**   Yes, sir, I do.

22   **Q.**   What is the basis for that understanding?

23   **A.**   From the information that they sent me.

24   **Q.**   This?

25   **A.**   Correct.

1    **Q.**   Do you have any information that any person using that

2    IP address took those steps and created an account,

3    established a user name and a password?

4    **A.**   It was my understanding that if they made it that far

5    that's the step that they had to have taken.

6    **Q.**   Well, couldn't they get that far and say this isn't

7    something I want to do and leave without ever looking at

8    anything that remotely resembles child pornography?

9            MS. WHITE:  Objection.  That's speculation and

10   that's not what the evidence here is.

11           THE COURT:  What he said, as I understand it,

12   Mr. Schles, is that he relied upon the statement made by the

13   foreign law enforcement agency and that's it.  That's what I

14   understood him to say.

15   BY MR. SCHLES:

16   **Q.**   So you would agree that you of your personal knowledge

17   do not know what, if anything, was done on the target

18   website by that IP address.

19        That's correct, isn't it?

20   **A.**   I only know exactly what the information that was

21   forwarded to me by the Department of Justice, CEOS, and the

22   FLA.

23   **Q.**   So there's no evidence that an account was created?

24   **A.**   Other than what you're holding in your hand, no, sir.

25   **Q.**   There was no evidence that a user name was created?

1    **A.**    No, sir, other than what I've already testified to.

2    **Q.**    There was no evidence that a password was created?

3    **A.**    Again, other than what I've testified to, no.

4    **Q.**    There was no evidence that any files of any kind, let

5    alone child sexual abuse and exploitation material 50 to 100

6    megabytes, was uploaded to the target website?

7    **A.**    Other than the website's requirements to be on it,

8    other than that, no, I have no specific evidence that that

9    was done.

10   **Q.**    And isn't it true that in the absence of those steps it

11   would have been impossible for the person using that IP

12   address to access any child pornography on the child -- on

13   the target website?

14   **A.**    I can't testify to impossible, but it seems unlikely

15   from what the website described.

16   **Q.**    In your affidavit did you make that clear to the

17   magistrate that you had no evidence that the target -- or

18   the IP address did any of those steps or accessed any child

19   pornography from the target website?

20   **A.**    In my affidavit I wrote exactly what was relayed to me

21   from a foreign law enforcement agency.  I didn't make any

22   guarantees.

23   **Q.**    Well, my question was did you inform the magistrate

24   that there was no evidence that that IP address actually --

25             MS. WHITE:  Objection.

1    BY MR. SCHLES:

2    **Q.**   -- attempted --

3         THE COURT:   Sustained.   He said what he said in

4    the affidavit.   If you want to ask him if he told the

5    magistrate anything more than what's in the affidavit, you

6    can ask that.

7         MR. SCHLES:   Thank you, Your Honor.

8    BY MR. SCHLES:

9    **Q.**   And later in the affidavit or elsewhere in the

10   affidavit there are descriptions of files, which from my

11   reading you viewed those files for the descriptions in the

12   affidavit?

13   **A.**   That is correct.

14   **Q.**   And what date was that?

15   **A.**   That I viewed them?

16   **Q.**   That you viewed them.

17   **A.**   I --

18        MS. WHITE:   Objection.   We're beyond the scope of

19   direct examination --

20        THE COURT:   Sustained.

21        MS. WHITE:   -- Your Honor.

22        THE COURT:   Sustained.   That has nothing to do

23   with probable cause here.

24   BY MR. SCHLES:

25   **Q.**   Do you have any knowledge of what was available on the

Special Agent Michael Fleener - Cross (Schles)

1    target website on May 25th, 2019?

2    **A.**    The descriptions that I put, three examples, are

3    examples of what would be found in that website if you

4    logged into it or if you gained access to it.  Those are

5    three examples of what material you would be able to view.

6    **Q.**    That specific material you believe was available on

7    May 25th, 2019?

8    **A.**    From what I was told, that's correct.

9    **Q.**    Told by whom?

10   **A.**    By the foreign law enforcement agency and DOJC office.

11   **Q.**    I thought you never spoke to the foreign law

12   enforcement agency?

13   **A.**    From reading through their letter.  I never spoke to

14   them, but the correspondence they sent me.

15   **Q.**    Is there correspondence in addition to what's at Bates

16   396 and 397?

17   **A.**    From what I understand, everything that CEOS gathered,

18   they gathered from the foreign law enforcement agency.

19            THE COURT:  Is there anything --

20   **A.**    That's my understanding.

21            THE COURT:  Did you have anything else?

22            Did you --

23            THE WITNESS:  Oh --

24            THE COURT:  Did you have anything else?

25            THE WITNESS:  No, sir, not at all.

```
 1                    THE COURT:  All right.
 2    BY MR. SCHLES:
 3    Q.   In paragraph 25 of your affidavit, on Bates Protected
 4    84, page 24 of the affidavit itself, you wrote:
 5         I am also aware from my training and experience the
 6    review of detailed user data relating to one Tor network
 7    based child pornography website found that it is exceedingly
 8    rare for a registered website user to access that website
 9    and never return?
10         You wrote that?
11    A.   Yes, sir, I did.
12    Q.   And that was based on an examination of a different
13    website, correct?
14    A.   Training and experience over 20 years of doing this.
15    Q.   I'm sorry?
16    A.   Just my training and experience and communication with
17    other law enforcement officers.  I know it's exceedingly
18    rare for somebody to visit a child --
19    Q.   So it's not even related to your examination of a
20    specific website?
21                    MS. WHITE:  Objection.  Asked and answered.
22                    THE COURT:  What are you trying to find out,
23    Mr. Schles?
24                    MR. SCHLES:  Yes, Your Honor.
25    BY MR. SCHLES:
```

1   **Q.**   How did you determine that it was, quote, exceedingly

2   rare for a registered website user to access that website

3   and never return?

4            THE COURT:  Access a registered website and never

5   return.

6            MR. SCHLES:  I'm sorry, Your Honor?

7            THE COURT:  It says access a registered website

8   and never return.  It doesn't say that particular website.

9            MR. SCHLES:  That's kind of my point, Your Honor.

10           THE COURT:  Yeah.

11       Straighten me out if I'm not -- if my hearing aid's

12   turned off.  For the record I don't have one, but it seems

13   to me he said this paragraph is based on his experience.

14   And he believes, based on that experience and his past

15   knowledge, that he thinks it's exceedingly rare to go to

16   such a site and never return.  That's -- for whatever it's

17   worth, that's what it says.  I don't -- I don't --

18           MR. SCHLES:  Well --

19           THE COURT:  I don't know what that adds to the

20   affidavit.  If I were reviewing it for a search warrant,

21   that wouldn't be anything I would hang my hat on, but --

22           MR. SCHLES:  Well, Your Honor, my point is

23   they're -- just because they say something doesn't mean that

24   it is probable cause.

25       It's exceedingly rare.  First of all, that's a vague

```
 1    term.  I don't know what exceedingly rare means, if it's one
 2    in ten, one in a hundred, one in a million.
 3         Secondly, it is not specific and it is misleading
 4    because, again, there is no evidence that this IP address
 5    was used to register an account on that website.  And if you
 6    have an unregistered person who on one occasion that's all
 7    we have, this is a way to obscure the fact that there is, in
 8    fact, evidence of only one perhaps instantaneous visit with
 9    training and experience that maybe something else happens.
10              THE COURT:  I've got your argument.  I've
11    sustained the objection.
12         Tell me if this isn't the law:  A tip from federal a
13    law enforcement agency is presumptively credible.
14         Is that the law?
15              MR. SCHLES:  Yes.
16              THE COURT:  Past working relationships between the
17    government and other law enforcement agencies are -- bolster
18    an affidavit?
19              MR. SCHLES:  I'm sorry?
20              THE COURT:  Bolster an affidavit.  Past working
21    relationships bolster.
22              MR. SCHLES:  Yes.
23              THE COURT:  You asked -- the United States works
24    with this foreign law enforcement agency.  I think we've --
25              MR. SCHLES:  I -- I agree they work so closely
```

1     that there's an agency relationship, Your Honor.

2              THE COURT:  Right.  And they use it to catch

3     predators or they have?

4              MR. SCHLES:  I'm sorry, Your Honor?

5              THE COURT:  Well, I guess that's not in the

6     evidence that they use it -- the information and cooperation

7     with that particular agency to catch predators.

8              MR. SCHLES:  Well, I would respectfully disagree

9     with that, Your Honor.

10              THE COURT:  I say that's probably not in the

11     evidence, is it?

12         Okay.  You know, I just wondered if there was anything

13     specific that you had seen that made you think that their

14     cooperation extended to this area of law enforcement.

15              MR. SCHLES:  Just independently reading on the

16     sting operation that they run that this goes on.  There was

17     Operation Playpen.  There's multiple of these, Your Honor,

18     where there is obviously a close history of collaboration.

19     The foreign law enforcement agency is clearly acting with

20     the prior knowledge and consent of U.S. law enforcement.

21         And when they know that they are essentially in a

22     cooperative relationship where if you obtain information

23     you'll give it to me, if I obtain information I'll give it

24     to you, but they're acting as agents for each other even in

25     the lack of a formal agreement, but I've also asked in the

1    motion to compel for disclosure if there are any agreements,

2    memorandums or understandings so that we can explore that.

3          THE COURT:  I'm going to deny your motion to

4    compel and your motion for additional evidence.  I don't

5    think under the facts of this case and based on the

6    arguments presented in your briefing here today and

7    considering the government's responses that you're entitled

8    to it.  So that -- we got rid of those motions.

9          The only thing we have left here is this motion to

10   suppress.

11         Do you have any other arguments on that?

12         MR. SCHLES:  Yes, Your Honor.

13         Basically my argument is twofold.  The affidavit itself

14   fails to establish probable cause.  Take out all the

15   boilerplate, take out all the training and experience, take

16   it's my opinion, which is essentially what we're dealing

17   with.

18         You have the sum total of evidence that is specific to

19   Mr. Dugan's IP address is that on May 25th, 2019, the

20   computer with that IP address accessed that target website

21   one time -- one time for an undisclosed duration, which

22   could have been as brief as a blink of an eye.

23         There's no evidence whatsoever it was used to view,

24   download, disseminate, receive anything that would be child

25   pornography.  And just the mere fact that on one occasion

1    that target website was accessed is insufficient to

2    establish probable cause.

3         It's different than *Bosyk* or *Bosyk* -- I'm not sure how

4    it's pronounced -- because that one occasion in *Bosyk* the

5    person was looking at child pornography and that was not in

6    dispute.

7         Here there's no evidence that that computer -- this

8    computer was used to view child pornography, to --

9              THE COURT:  Except what was received from the

10   foreign law enforcement agency and what they said and what's

11   been read to you by me and by --

12             MR. SCHLES:  They used the vague phrase child

13   exploitation and abuse material without describing it.  And

14   we have the screenshots that I was -- there's no child

15   sexual abuse in any of these pages.  There's some Russian

16   and some English that looks like any number of forums or

17   anything.  There's not a single image.  There's not even a

18   drawing or a silhouette, which I think was the one in

19   Playpen, where it was a logo that was obviously a sexualized

20   content.  There's none of that.

21        A person could, in fact, be on the Tor website for any

22   number of reasons, legitimate reasons, be it some -- someone

23   has posted a link.  You click on that without knowing what

24   it is because it is kind of a random series of numbers and

25   letters.  You don't know it's taking you to a child porn

1     site.  You end up on this page that really discloses nothing

2     and you navigate away.  There's no probable cause that

3     person was attempting to facilitate child pornography.

4             THE COURT:  Do you have anything to say in

5     closing?  I'll let him respond.

6             MS. WHITE:  Thank you, Your Honor.

7         I've listened to Mr. Schles for over an hour.  And I

8     would just caution the Court that just because he says it

9     doesn't mean it's true.

10        Mr. Schles keeps saying it was accessed one time.  And

11    Mr. Schles keeps saying that he didn't get past the home

12    page.  And Mr. Schles keeps saying that he didn't actually

13    see any child pornography.  All of that is speculation.

14        What we do know is what the warrant said.  It described

15    how the Tor network works.  It described the foreign law

16    enforcement agency's information verbatim and that was this

17    IP address was used to access online child sexual abuse and

18    exploitation material and then it describes how the website

19    worked.

20            THE COURT:  All right.

21            MS. WHITE:  That coming from a credible law

22    enforcement agency with a history of reliable information is

23    sufficient probable cause.

24        Now, I heard Mr. Schles say that there's an agency

25    relationship.  Well, he respectfully just made that up.  He

1    has no evidence to support that.  And I'm a little bit

2    surprised to hear it.  I asserts the United States had prior

3    knowledge of this investigation.  He doesn't base that on

4    anything.

5         And, Your Honor, I've sat quietly because I did not

6    want to offend the Court, but at this point I would like the

7    Court to carefully consider what, if any, evidence

8    Mr. Schles has shown you to present his speculation.  He can

9    say whatever he wants, but the affidavit and everything in

10   it has been backed up by the documentation and the officer's

11   testimony.  We believe that that was sufficient probable

12   cause for Judge Tinsley to grant the warrant.

13              THE COURT:  Anything to say in closing,

14   Mr. Schles?

15              MR. SCHLES:  I'm not speculating that the only

16   evidence in the affidavit in support of the application for

17   the search warrant is that on a single occasion on May 25th,

18   2019, that IP address was used to access the home page of

19   the target website.  And that's the sum total of the

20   evidence that is specific to that IP address and to my

21   client's case.  All the rest of it is just generalities,

22   specifics, speculation.  None of it has anything to do with

23   my client.

24        You're right about *Bosyk* and the single click.  In that

25   case that was found sufficient to establish probable cause

1    in the absence of any corroboration.  Different situation

2    because it was a single click to a video of child sexual

3    activity.  This was a single click to a page of words.

4              THE COURT:  All right.  Thank you.

5         I overrule the motion to suppress.  I find that the

6    affidavit from the magistrate was sufficient as a basis for

7    probable cause.  The fact that the affidavit relies -- or

8    contains within it the information from the foreign law

9    enforcement's site and that the officer relied upon that and

10   the magistrate relied upon that is sufficient basis for

11   probable cause to believe that the facts that he accessed

12   the site for child pornography is very plausible and

13   probable.

14        It's improbable to believe he inadvertently accessed

15   this site.  They don't -- the government has no obligation

16   to prove that he actually saw pornographic material or that

17   he downloaded it.  They have enough -- more than enough

18   evidence to believe that it's probable and indeed plausible

19   that he did so.

20        In any event, even if there were not sufficient

21   evidence, the issuance of this warrant by a magistrate judge

22   of this court, after review of the lengthy materials in the

23   affidavit based on the foreign law enforcement agency's

24   materials, is certainly sufficient for the officer to

25   believe in good faith that the warrant was lawful.  And

1    there's no indication that the persons who executed the

2    warrant had any reason to question the lawfulness or

3    legitimacy of the warrant.

4         Anything further to come before the Court?

5              MS. WHITE:  No, Your Honor.

6         Thank you.

7              MR. SCHLES:  Your Honor, if I may at this time, I

8    will follow it up with a written motion, but I would move to

9    continue the trial date.  In light of the Court's rulings

10   today, I'm going to need some additional time.

11             THE COURT:  I'm going to grant your motion right

12   now and give you a new date.

13        Robin?

14             THE COURTROOM DEPUTY CLERK:  How long does he

15   need?

16             THE COURT:  Tell me the date.

17             THE COURTROOM DEPUTY CLERK:  That was only a week.

18             THE COURT:  How about the 17th?

19             MR. SCHLES:  17th of May?

20             THE COURT:  Uh-huh.

21             MR. SCHLES:  Hold on, Your Honor.

22             THE COURT:  I've got other -- as you probably

23   know, I've got other trials and we're going to get jammed

24   up.  If we don't do it then --

25             MR. SCHLES:  I am available the week of the 17th,

1   Your Honor.

2               THE COURT:  Is that all right?

3               MR. SCHLES:  Yes, that works for me.

4               THE COURT:  Is that okay for you?

5               MS. WHITE:  Yes, Your Honor.  I believe my agent's

6   available.  I'll make myself available as well.

7               THE COURT:  All right.

8        The motion to seal, I'm going to grant it.  I grant the

9   motion to seal at the present time.  I'm going to review

10  them later.  I have some questions about the breadth of what

11  is sealed, but I'll deal with that at a later time.

12       I'm always very conscious of the public's presumptive

13  access to materials in criminal matters.  I feel like that

14  the motion to seal may be overly broad.  And as a courtesy

15  to the Court I would ask the government and the defendant to

16  review those motions and perhaps narrow them for me, but at

17  this time they're granted at stated.

18              MR. SCHLES:  For what it's worth, Your Honor, I

19  filed my materials under seal out of an abundance of caution

20  because it is a very broad protective order.

21       I have no objection to it being filed in the normal

22  fashion without seal, but I don't really have a strong

23  opinion either way.

24              THE COURT:  I'll take that into account and I'll

25  let the government sort through what they feel is essential

```
 1    to be sealed.

 2              MS. WHITE:  Thank you, Your Honor.

 3         Would you like me just to submit an amended response

 4    and redact what we would like to be kept under seal?

 5              THE COURT:  I think that will work.

 6         Do you agree, Mr. Schles?

 7              MR. SCHLES:  That works with me.

 8              THE COURT:  That may be done.

 9         I tell you what, I just won't enter the order granting

10    the motion until I consider this.

11         How about that?

12              MS. WHITE:  I'll get that to the Court.

13              THE COURT:  In the meantime it's still pending.

14              MS. WHITE:  Thank you, Your Honor.

15              THE COURT:  All right.  And it's pending under

16    seal.

17         Anything else?

18              MR. SCHLES:  No, Your Honor.

19              THE COURT:  All right.  I'll see you on the 17th.

20         Court's in recess until what time?

21              THE COURTROOM DEPUTY CLERK:  We're done for today.

22              THE COURT:  We're adjourned for the day.

23

24         (Proceedings concluded at 11:20 a.m., April 29, 2022.)

25
```

1    CERTIFICATION:

2         I, Kimberly Kaufman, Official Court Reporter, certify

3    that the foregoing is a correct transcript from the record

4    of proceedings in the matter of United States of America,

5    Plaintiff v. Raymond Dugan, Defendant, Criminal Action No.

6    2:21-cr-00127, as reported on April 29, 2022.

7

8    s/Kimberly Kaufman, RMR, CRR, CRC           January 15, 2023

9    Kimberly Kaufman, RMR, CRR, CRC                   DATE

10

11

12                        - - - - - -

13   CERTIFICATION:

14        I, Kimberly Kaufman, Official Court Reporter, certify

15   that the foregoing is a correct redacted transcript from the

16   record of proceedings in the matter of United States of

17   America, Plaintiff v. Raymond Dugan, Defendant, Criminal

18   Action No. 2:21-cr-00127, as reported on April 29, 2022.

19

20   s/Kimberly Kaufman, RMR, CRR, CRC           March 2, 2023

21   Kimberly Kaufman, RMR, CRR, CRC                   DATE

22

23

24

25